The the the the the the the the the the Next case is Bell Supply Company versus the United States and a number of other companies U.S. Steel, Maverick, Boomerang 2017, 1492, 95, 1504 We're going to have three five-minute arguments, correct? That's correct, Your Honor. One of them will be rebuttal. That's correct. And you are Mr. Ansorge? That's correct, Your Honor. Please proceed. May it please the court, my name is Joseph Ansorge of Quinn Emanuel, Urquhart & Sullivan. We represent United States Steel Corporation. Today, counsel for Maverick will be discussing the substantial transformation test. Counsel for Boomerang will handle rebuttal. And I have the privilege of speaking with you about commerce's discretion when it comes to the interpretation of the plain language of its scope orders. So I get you all want to divide arguments and you all want to represent your clients and have separate issues. But the problem with this is we want to ask certain questions about certain things. And what I want to know about, and I don't know if it's you or one of the others, is what's the point of 1677 if we have the substantial transformation test? So that might be the most appropriate question for it. I'd be happy to answer that question. Let's hear an answer to that. I mean, Tim, I don't want to take away your argument time. I know you're representing your client. But I'm not particularly interested at this minute in what you have to say. No offense. I think the important question for me is what he's going to say. So can we have him up? Yes. Would you prefer to start with him? If you're not prepared to answer that, then we will hear from someone who is. I mean, if you want to answer it, go ahead. Well, if I can provide an answer, then he can provide another answer, if you'd be comfortable with that. Meanwhile, the clock is ticking. Use your time however you see fit. This has been a problem for decades in these trade cases when the private parties divide up time like this. So here's my question. The substantial transformation test you think Commerce appropriately used here, how does that relate to the circumvention test? Why would we ever need circumvention if we have a substantial transformation test? Well, Your Honor, we believe that the circumvention test is for the more narrow purpose of explicitly expanding the scope of an anti-dumping and countervailing duty. Can you give me an example of how that might happen in these kind of factual circumstances? So, for instance, do you mind if I just go ahead? You all have to decide this. I mean, this is frustrating to me. One of you get up here and answer my question. So, Your Honor, so your first question, Congress, when it was enacting the URAA, the legislative history with respect to the URAA, in the Statement of Administrative Action expressly recognized that the two tests exist, and they exist to answer different questions. And Congress explicitly stated, outside of a situation involving circumvention of an anti-dumping order, a substantial transformation of a good in an intermediate country would render the resulting merchandise the product of the intermediate country. So, to go to your other question as an example, so the scope of this case covers oil country tubular goods, but a certain subset of oil country tubular goods, casing and tubing, the scope expressly excludes drill pipe. Right. So, hypothetically, if the unfinished OCTG that was exported from China went to Indonesia, and if it was possible to convert that unfinished OCTG into drill pipe, the circumvention analysis in this situation would be appropriate. So, Congress can make a finding that even though the pipe is no longer explicitly covered by the order because it's no longer finished or unfinished tubes, it's been, the order's been circumvented by converting it to drill pipe. Right, because the order doesn't include drill pipe. But we don't get here because the order explicitly includes finished and unfinished tubes. Correct. And so the question for the Commerce, which Commerce correctly identified in its original determination was, what is the country of origin? Before we get into all that, just to understand the interplay between 1677 and the Substantial Transformation Test. Okay, you've identified an example where 1677 can capture something that the Substantial Transformation Test cannot. Is it fair to say, though, that everything that the Substantial Transformation Test can sweep in is fully encompassed by 1677? Not necessarily, Your Honor. In Pierre Bering, for example, in a different case where the court looked at whether merchandise that left a subject country that was assembled in another country that was completed, the court looked at the Substantial Transformation Test there found that it wasn't satisfied, and then said it could then look at a circumvention analysis. It recognized the very situation we have here. But if you reach the conclusion or the determination that it's not been substantially transformed, you don't get to the circumvention test because it's never left the order. The circumvention analysis, as the court in Pierre Bering noted, it's an additional test to determine whether I need to expand the order to bring that product in. All right, I guess what I'm wondering is, is it redundant to have the Substantial Transformation Test anymore? Because whatever that could be captured using that practice would inevitably be captured in 1677. No, Your Honor, I don't think so. And Congress didn't indicate that it thought it was redundant either, again, in the legislative history. Can you think of an example, kind of like the example you gave to Judge Hughes about how 1677 is broader than Substantial Transformation? So I think in a different example, if you had a product that was subject merchandise that left the subject country, went to another country, and was assembled into something else that's not part of the class or kind as a possibility, even in this situation, if commerce looked at the unfinished tube and it went someplace else, it may be substantially transformed, but it's also possible it could be included in circumvention. I'm not aware of an example that may exist. But clearly, Congress thought that there wasn't a conflict and that there are two separate tests to answer two different questions. One is to expand, and the other one is to determine what's of the country. I'm a little confused. And part of this is because Commerce came up with multiple reasons for why these tubes were included in its orders. I think partly in response to try to satisfy the trade court. But it seems like its first scope ruling said, these are finished tubes entering the United States, which is indisputably correct, right? They're finished tubes. They're not unfinished tubes. The tubes coming from Indonesia were finished. The finished tubes that we're looking at, the things coming into the United States that are subject to the orders are finished tubes. Correct. And the order covers finished and unfinished tubes from China. And so what we have to figure out is, are these tubes from China? Isn't that correct? Correct. And that was what Commerce was seeking to do when it applied the substantial transformation test, is were those tubes still Chinese? Right. It just confused me a little bit because then Commerce pivoted. Because they said, this is finished tubes. I think that's what they said in their first scope ruling. These are finished tubes. And the order expressly covers finished tubes from China. And these are from China because of the substantial transformation test. But then they went back and said, well, these are also unfinished tubes from China. And so they're covered. And does it matter which rationale we rely on? Actually, just to clarify, Your Honor. So in the original determination at page nine, and I can give you the JA site, but I have the original determination in front of me. Commerce says, as courts have recognized, the physical merchandise and the country of origin are two separate parameters for defining subjects to an order. Furthermore, the scope language is not ambiguous. It clearly covers finished OCTG and unfinished OCTG, green tubes from the PRC. This is why we were examining whether the substantial transformation has occurred in a third country. As described more fully below, we continue to find that the products in question were not substantially transformed. What it's saying there is the scope expressly covers the unfinished tube when it left China. And therefore, I have to determine whether it's been substantially transformed. In the second, or in the first remand that you're referring to. I'm not referring to the remand. I'm talking about the final scope ruling. Right, and that was what I was referring to here. And then you would ask the question about, in its second redetermination, it revised its analysis pursuant to the court's decision where it then said the subject merchandise, when it left, it was unfinished. Right, I get that. But the first scope ruling relies on the fact that there are finished tubes coming in in the United States. That's on page seven of the order, I think. Correct. It's indicating that the finished tubes themselves are. So what I'm getting at is if I agree with this and agree with the other one, does it make any difference to which rationale we find was suitable to uphold Commerce's position? Does it have any impact on the case? I would say the rationale could support including, either determination would support including it. I would say though that the lower court was incorrect in taking the substantial transformation test away from the department. And we argued both in the alternative in our brief, but frankly, the more proper interpretation is that Commerce's original determination with respect to the substantial transformation and applying that to determine country of origin was correct. And frankly, I think that should be the determination that is upheld. But you can't uphold both and we've argued both in our briefs. Okay. Thank you, Mr. DeFrancisco. We'll go back to Mr. Aniswar and give you three minutes to move your presentation. Thank you, your honor. I'm going to talk about Commerce's discretion. That's right, your honor. Commerce has exercised its discretion to not be here. Why do you think that is? Frankly, I do not know, your honor, why Commerce is not here today. I do know that it doesn't change the underlying record, which we believe clearly shows that Commerce was denied the substantial deference that is due to it in interpreting the show of its own. Are you aware of whether Commerce has changed its practice or ITC or somebody to write orders such that it makes it much more crystal clear that there's some kind of substantial transformation language that's now written into these orders? Do you have any idea of that? We believe that this case has caused a possible practice change of Commerce by writing orders differently. So we do believe that that is the case, your honor. Well, what do we, who's Commerce, which Commerce opinion are we reviewing? The ultimate one or the original one? We would like you to review the original one. That's what you'd like, but that's gone. And so we're, I would think, reviewing the ultimate decision, right? Well, the second decision, if I may draw your attention to that, your honor, Commerce explicitly makes under protest. We believe that both its initial scope ruling as well as- The earlier decision was under protest. Was that language used in the final Commerce decision? Your honor is correct. It is not used in the final Commerce decision. Your honors, unlike the preceding- What do you mean it's not, you mean the final Commerce decision after the multiple remands, when they just give up and switch their position, they just don't include that under protest? That's correct. But that doesn't remove your right to appeal or probably Commerce's right to appeal those earlier incorrect interlocutory rulings. Absolutely. If they are incorrect, we think they are. And we believe that they're incorrect. And we believe that unlike a lot of the preceding patent cases- Because you couldn't have, and Commerce couldn't have appealed those earlier interlocutory rulings until final decision. That's right. So you're gonna argue about discretion, but is how much discretion is really necessary here? If the order says this covers finished and unfinished tubes from China, then it seems pretty plain on its face that it covers finished and unfinished tubes from China. There may be a dispute about what is a finished tube from China, but do they need discretion to do that? Is the discretion to allow them to use the Substantial Transformation Test? Yes, that is part of the discretion. The discretion is also looking at the unambiguous language, which you just cited, Your Honor. Finding that finished and unfinished tubes are both cited in the order, and then concluding, we believe logically, that if a set such as unfinished OCTG from the People's Republic of China is listed in the order, then a subset, which would be unfinished OCTG that is subsequently finished in a third country, could also logically be read into that order. We therefore believe that Commerce was reasonable in its interpretation and in its initial scope rulings because it both was specific. It followed this court's instructions from FedMint Resources, King Supply, DeFerco, and other cases by looking at the plain language of the orders. And in that plain language, as you pointed out, it came across unambiguously finished and unfinished OCTG. It then concluded that as long as OCTG was not substantially transformed in a third country, it would therefore still fall under the scope of its orders. Secondly, the logical step of following and looking at the class of OCTG that is produced, and then concluding that from that, an OCTG that is subsequently finished elsewhere, we believe is a sound principle and basis for interpretation. And finally, the other K1 factors, which Commerce considered, the petition, as well as the ITC's threat injury determination, all pointed towards green tubes being considered an important asset and element within the scope order. Why do we find the language ambiguous? I mean, Judge Kelly did some very thorough, lengthy opinions concluding that this language was just ambiguous and decided that because it was ambiguous it wasn't necessarily included in the scope. And so therefore, any inclusion would be an addition, which you can't do absent a circumvention analysis. Why is that wrong? Your Honor, we believe it's a far too stringent standard of analysis that's nowhere reflected in any statute. The standard is either a product is explicitly listed or it can be reasonably interpreted to be covered by the scope of the orders. If we... So your view is even if the order is ambiguous, which is a problem that Commerce is presumably going to address in the future in these kind of orders, it still can be reasonably read, and that Commerce gets that deference as opposed to it being read against them. That's correct, Your Honor. We believe that. Do you have precedent for that? Well, as this court has held in King's Supply, Commerce is granted substantial deference when it comes to the interpretation of the scope of its own orders. And I quote, the meaning and scope of an anti-dumping orders are issues particularly within the expertise and special competence of Commerce. We believe that King's Supply represents a good example and precedent. Thank you, Counsel. I will hear from Mr. Cameron who will cover all basics. One can only hope, Your Honor. Thank you, Your Honor. Before we get sidetracked into this 1677 stuff, can you just start out with the order and the language? Because I'm not convinced that this order is all that ambiguous. It covers goods from China. It covers finished and unfinished goods from China. And so we have to determine in the instance of these particular items that are coming across the border, if they're from China. And isn't the substantial transformation test the test that Commerce routinely uses, not just in scope rulings, but in everything to determine country of origin? Well, actually, Your Honor, I think that it isn't that simple because the issue on the scope is, what is it when it comes to the United States? This pipe and tube, this OCTG, it came from Indonesia. So there's no question about that. So the question that arises is, okay, this OCTG came from Indonesia. Is it still covered by the order from the covers finished and unfinished from China? And the answer was, well, yes, it does cover unfinished that comes in from China. You're saying it physically came from Indonesia, but the order covers finished tubing from China. Right, but this wasn't finished in China. But it could still be considered finished tubing from China if the country of origin for this product is China. Well, Your Honor, this is where your question about 1677JB comes in, because that is exactly what the Congress supposed. And the Congress went and designed a statute to cover this specific thing, to determine is this, if it's not from China, if this isn't from China, directly from China. What about the legislative history that the other side? That is not what the legislative history says. And actually, if Your Honor would read Peer Baring, which is 986 Fed Sub 2nd, 1389, which goes extensively through the legislative history. What he's talking about is section 1677.12. And he's suggesting that 1677.12 somehow has a separate country of origin plan in it. But the problem is that when they cited 1677.12, they didn't give you the full site of it. And actually, it only refers to the countervailing duties. It doesn't refer to scope. It doesn't refer to anti-dumping. This is basically a leftover from the original countervailing duty section 1303. It doesn't go to country of origin. Moreover, is there anything in the legislative history that suggests that 1677.j is designed to displace the pre-existing- 16, well, there is no reference to substantial- Mr. Cameron, it's best not to cut off- Oh, I apologize, Your Honor. If you could lower your voice- Yes, Your Honor, I apologize. Proceed. Yeah, so I guess the question was, is there anything in the legislative history that indicates that 1677.j was designed, at least in part, to displace the practice of construing orders using the substantial transformation? Well, it's very interesting. What 1677.j, the legislative history demonstrates is, first of all, that they had a problem. The problem was what happens when a product is assembled in another country? How do we determine that? And they had a statute in 1988, and they found that they had some difficulties in administering it, because it didn't really fully take care of everything. So in 1994, partly as a result of the WTO, they made some amendments to it. And these amendments, again, are to deal with this. Substantial transformation is nowhere referred to in the legislative history. Substantial transformation is nowhere referred to in Section 351.225, which is the entire examination of what are the scope procedures? What are anti-circumvention procedures? How do we proceed? There's no mention of substantial transformation in there. If substantial transformation is the great solution to how we determine the country of origin, why is it that in a uniform regulation that covers all manner of scope, country, circumvention, everything, why isn't it mentioned? It's not mentioned because this is something that the Commerce Department is doing instead of what Congress passed, which is 1677J, and that, if you look at the terms of that provision. How long was Commerce using the substantial transformation test before this legislation was passed? Well, I don't know the answer to that, Your Honor. This legislation was originally passed in 1988, and we don't have any, we have not seen any citations to any cases upholding this. We do have peer bearings that said that the- I mean, it seems to me that your argument cuts both ways. I mean, if the test was out there and known and Commerce had been using it, if Congress wanted to displace it, they would have mentioned it. Particularly given, I mean, Commerce's broad discretion in these areas. Well, that's one way to look at it. I think that the way that we look at it is, number one, if it was out there, then Commerce would have referred to it, the Congress would have referred to it as in the legislation somewhere, and it's not referred to. Number two, the Commerce Department would have referred to it somewhere in their regulations on, well, okay, we have these problems. This isn't the first time this has come up. So, what is the procedure that we have? Secondly, you're suggesting that the substantial transformation test is this set, fixed, somewhere. This is a moving target. This changes all the time. We had six factors in pure bearing, four, three of which the court basically said were irrelevant, and said it was an end run around the statutory provisions in 1677 J.B. So, I think we have a problem here in that what we are asked to believe is that, well, there is this separate way that we look at scope and that we divine the country of origin for an order, and we only get to the specific provision that covers third party assembly and processing, which is on all fours with this case, with the facts of this case, and on the facts of pure bearing. We only get to that, well, we're not sure when we get to that. We get to that if we want to, and this was the problem that the courts below had. The courts below both said, well, wait a second. Based on what do you substitute the discretion of the Commerce Department to ignore a specific statutory provision that governs this very thing? And it gets to the question of... Well, I guess that's the question. Right. Does 1677 J.B. supplement what came before, or does it completely... There's no evidence that it, well, that's a good question. I think the answer is that there is absolutely no evidence that it is supplementary. The evidence is that it is part of the same statute, and that this is the way that we deal with the question of third country processing, and it's very clear on it, and there's a reason for that. Because... Commerce has a regulation called Rule 134.1, defining country of origin, and defining... You mean customs? Or customs, yeah. Yeah. And so I guess what I'm wondering is... Well... To what extent does that rule in fairness? Well, that's a good question, Your Honor, because the Customs Service in 1991 had determined that the country of origin for OCTG is the place of heat treatment, which is in Indonesia. That's using the country of origin of CBP. Now, the Commerce Department says, well, we make our own decisions with respect to substantial transformation, so we don't care what they do. But that is the way that the Customs Service does it. There was a determination on the record for 20 years before this case ever came up that said, yes, country of origin is that. This company that we represent was established in 1987. They have to import the inputs in order to produce the OCTG. So this wasn't a new phenomenon. Then in 2010, there was another decision by CBP again, which reinforced that, and that's what provoked the petition, the scope petition, which said that they wanted Commerce to specifically reaffirm that the order covers OCTG regardless of where it was finished. Well, that's very interesting, because that language never appeared in the scope language itself. It never appeared in the petition. It never appeared anywhere. Here's the problem, is it seems to me that both sides could benefit from the additions of words to the order. You, in fact, I think very interestingly a couple of minutes ago, referred to whether it directly came from China, which the trade court also referred to, I think, but there's no directly in the order. On the other hand, your friends on the other side want exactly what you just described, that it covers tubes that come from China if it's a country of origin, even if they are not substantially, if they're not substantially transformed in a third country, but the order doesn't explicitly say one way or another have those conclusions, so aren't we then back to deferring to Commerce on its interpretation of its order? Well, your honor, I don't believe we are. I think what we are back to is looking at statute because the Commerce Department does have a statutory provision that deals with third country processing, and what's the difference between substantial transformation and not insignificant and not minor, which is the standard for the circumvention. But sure, but that statute, if the order had included tubes that were- Sure. They wouldn't have to resort to that statute. You're absolutely correct. But that's the question then. Does this order include those tubes or not? And that's where we get to deferral because in deferral what it says is if the scope says that it covers further processing and to get to your honor's earlier question about have there been any changes, the answer is yes. Now, there are many cases in which they say and if it's further processed, then this order still applies to that. We gave you two examples in our brief with respect to DRAMs and with respect to solar panels where it was explicitly stated. And yes, you're absolutely correct. In those circumstances, what's the answer? The answer is you look to the order first. We don't look to anything else but the terms of the order. But this order didn't say that. And this order didn't say regardless of where processed. But it also doesn't say directly from China. Well, because it says from China and was this from China? Isn't there? But that's the question. Is it from China? And the answer is this is from Indonesia. That's not Commerce's answer. Commerce's answer is this is from China. The plain meaning of from China, with all due respect, is from China. I mean, and if you want to interpret it, then you have to go to either A, is there anything in the petition? The plain meaning of from China means a physical type of meaning rather than a country of origin meaning. Well, Your Honor. I mean, I don't see anything plain at all about that, particularly in the context we're dealing with where Commerce routinely looks at country of origin to determine where a product is from. Well, I guess, well, Your Honor, I guess I'm puzzled because I have not seen any court decisions. I know what Commerce does. But the question is, I have never seen anything that has sustained that. The Commerce Department has its own way of doing it. And the court in pure bearing, Andy here, has basically called that into question saying, well, that's very interesting, but you have a whole different set of variables that you are applying, not the statutory set, and why not? And the reason is because the statute also puts limits on what Commerce can do in terms of how they interpret it. The factors are different. They have to find that it is not minor and insignificant. And that's important because substantial transformation doesn't. And that means there's gonna be a difference. And so the question is, if you have this provision, can you actually do substantial transformation as a test? And I think that the court below and the court in pure bearing, which for some reason is cited by counsel for Maverick, I think that both of those cases stand for the proposition that no, you cannot, because there is a provision that directly applies. People ask me, where are you from? And I say, oh, I'm from California. And they'll say, no, where are you really from? Yeah. And they'll say, oh, well. Cleveland. We're from China. Oh, okay. Cleveland, China, it's the same thing. I understand that. But that's- Cleveland and China are not the same. Well, it depends on where you go. Well- I don't know where you go. Well, I think that's right, Your Honor. But that's the reason that we look to the petition. What did the petition discuss in terms of unfinished? The petition was very specific. It talked about, well, the reason we're covering unfinished is that unfinished OCTG enters the United States and is finished in the United States. This is part of the scope. So that's the basis for that. And we believe that the statute is clear on this. And we believe that the court below was right. And we do heartily recommend peer bearing because peer bearing also goes to this issue of the legislative history. And it is not what you heard from petitioners this morning. Thank you very much, Your Honor. I appreciate your time. And your patience. Mr. Boe will conclude. Yes, Your Honor. I'd like to attempt to clarify the legislative history somewhat. The 1988 legislative history does not discuss substantial transformation in the context of 1677J. We believe because Congress assumed that the courts, that commerce and customs would continue to apply the substantial transformation standard, which has been the standard for the way of looking at country of origin issues for longer than anyone in this room has been alive. The 1994 Statement of Administrative Action at page 844 contains language which is quoted in Maverick's brief at 39 to 40, which we believe indicates that the Congress envisioned the two would coexist. That you would first, if necessary, look at substantial transformation to determine whether a product was from a country covered by an order. And then you would look at 1677J, if necessary, if the physical characteristics of the imported merchandise did not fall squarely within what the court has recently called the literal scope language. If you can go a little bit outside that in order to combat circumvention. I think the legislative history, both 1988 and 1994 make perfectly clear as the title of the statute does, that 1677J is intended to prevent circumvention of an order. So it gives you substantial transformation plus a chance in limited circumstances. And I acknowledge they have to be limited because you're going a little beyond the literal scope language. You do run into potential WTO concerns. It gives you a chance to go a bit beyond the scope if necessary in a situation where it's being used to circumvent the order. Which goes back, I think, to an issue that the court previously raised in one of its questions, which is what would happen if we just threw out a substantial transformation test and all there were was 1677J? I think what would occur then is you would have manufacturers in countries subject to orders looking around the world and saying, well, what's the least we can do to get out of the order? We don't have to change the class or kind of merchandise. We don't have to go so far as to conduct a substantial transformation in a third country. All we have to do is go a little bit beyond the minor or insignificant processing that's envisioned in 1677J. All we have to do is add a little bit more extra value. So it would give them an opportunity to find new ways of avoiding anti-dumping and countervailing duty orders. And in that way, ironically, 1677J, which Congress intended to prevent circumvention, would facilitate it. Meanwhile, what would customs be doing? Customs, presumably, as its regulation indicates- Can you repeat that? Okay. Because I got lost. You seem to accept the premise that substantial transformation is fully covered by the circumvention statute. And then if that is true, then why would taking away the substantial transformation test, because now it's completely covered by the circumvention statute, create some kind of outcome where the domestic industry would be worse off? I understand your question, Your Honor. We do not believe that the 1677J covers the substantial transformation test. We believe that the test outlined in 1677J is relatively narrow compared with substantial transformation. So you could have a situation, for example, where an order covers pipe up to 16 inches outside diameter and someone adds a coating, which takes it a little bit beyond 16 inches outside diameter. And that's not a substantial transformation, but it could be covered under 1677J. Conversely, you could have a situation where someone performs activities in a third country which do not rise to the level of substantial transformation and yet are encompassed within 1677J and thus get it out of the order. Anything further? Unless the court has additional questions, I do not. Thank you, gentlemen. We'll take the case under review.